UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TODD TOMANY,<br><br>  Plaintiff,<br><br>  v.<br><br>VILLAGE OF UNIVERSITY PARK, a Municipal Corporation; the BOARD OF TRUSTEES OF THE VILLAGE OF UNIVERSITY PARK; the UNIVERSITY PARK POLICE DEPARTMENT; POLICE CHIEF CRAIG MARTIN, individually and in his official capacity; and ANTHONY M. MARTIN, SR., individually and in his official capacity,<br><br>  Defendants. | No. 05 C 1734<br>Judge James B. Zagel |

**MEMORANDUM OPINION AND ORDER**

This is a claim for retaliation against a police officer. The defendants are his employers and his superiors. The cause of the retaliation is Plaintiff's testimony in a federal lawsuit brought by Fred Kaupas. The alleged retaliation consisted of the removal of Todd Tomany from his role as a supervisor on his shift and the refusal to assign him to a shift where he would become a supervisor. Tomany also claims that he was denied training opportunities. The principal actor against Tomany is Anthony M. Martin, Sr., a Deputy Chief. I consider here Defendants' Motion for Summary Judgment.

**I. Standard of Review**

Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.*

*R. Civ. P. 56(c)*; s*ee also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-33 (1986). If the moving party meets this burden, the nonmoving party must then go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. *Fed. R. Civ. P. 56(e)*. A genuine issue of material fact exists when there is evidence on the basis of which a reasonable jury could find in the nonmoving party's favor, allowing for all reasonable inferences drawn in a light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The non-moving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) (*citing Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). The Seventh Circuit has repeatedly held that summary judgment is "not a dress rehearsal or practice run," but rather "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005).

The retaliation provision of Title VII forbids an employer "to discriminate against any individual . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a). A Plaintiff has two distinct ways of establishing a prima facie case for unlawful retaliation: the direct method and the indirect method. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004). In order to survive summary judgment under the direct method, Tomany must present direct evidence that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two. *Id.* (*citing Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003). Alternatively, under the indirect

method, Tomany must establish that (1) he engaged in statutorily protected activity; (2) he was performing his job according to his employer's legitimate expectations; (3) despite his satisfactory performance, he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id*. (*citing Williams v. Waste Mgmt. of Ill.*, 361 F.3d 1021, 1031 (7th Cir. 2004); *Stone v. City of Indianapolis Public Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002)). If Defendants offer some legitimate, non-discriminatory reason for the challenged actions, Plaintiff must establish that the proffered reasons are pretextual. *Crim v. Board of Educ. of Cairo School Dist. No. 1*, 147 F.3d 535, 541 (7th Cir. 1998). It is not sufficient for Plaintiff to prove that the reason was doubtful or mistaken. *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995) (pretext "means a lie, specifically a phony reason for some action."). Normally the persuasiveness of a defendant's explanation is for the finder of fact to assess, "unless the court can say without reservation that a reasonable finder of fact would be compelled to credit the employer's case on this point." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005).

## II. Analysis

Martin joined the University Park police department in January of 2003 as Director of Investigations. He was promoted to Deputy Chief in March of 2004 and ultimately terminated in March of 2005. Martin was one of two men who assumed the functions of Fred Kaupas, who was both Deputy Chief and Director of Investigations. Mel Easley took on the role of Deputy Chief.

Fred Kaupas sued the village trustees, its manager, its chief, Sergeant Gregory Box, and other unnamed conspirators for racial discrimination. *See Kaupas v. Vill. of Univ. Park*, No. 02-

3674, 2003 WL 22048173 (N.D. Ill. Sept. 2, 2003). The context of the case was the change in racial composition of the police department from roughly equal numbers of blacks and whites to predominantly black. The police chief is black, as are Martin, Easley, and Box. In the Kaupas case, Tomany gave a deposition in which he testified that the police chief, as well as Easley and Box, were racist. Martin was not a defendant in the case.

It would be expected that a dispute like this would divide the personnel of any small to medium size agency or enterprise, and it did at University Park Police Department. Officers took sides regarding the case, and Martin believed he was hired, in part, to address these divided allegiances. Martin knew that Tomany had testified for Kaupas. For purposes of this motion, I assume that Martin knew the content of Tomany's testimony.[1]

Martin, in deposition, offers a legitimate explanation of his actions. Tomany, he says, was deprived of his supervisory pay and position[2] for good reasons. Martin relied on rumors and comments from others to the effect that Tomany (1) engaged in racial profiling, (2) was

---

[1]There is a dispute about precisely what Martin knew. Martin did think the case was about overtime. The dispute over what else Martin knew about the case is immaterial. He knew that by testifying for Kaupas, Tomany was testifying against the department and its chief and deputy chief, who were also Martin's superiors. The motive to retaliate could be found to exist on this basis alone, although it is fairly weak evidence of Martin's motive since Martin was not a long-time member of the department who had built ties over a long period of time with fellow officers who had risen through the ranks with him. Nor was he personally accused of anything by Tomany. What remains is the possible motive to curry favor with Easley or the chief or to respond to orders or suggestions by them that he "take care" of Tomany. There is no evidence that such orders or suggestions were given, and Easley is not sued in this case.

[2]The police department followed a rule, common in many departments and in the Armed Forces. When all officers are of the same rank, the most senior officer supervises. In University Park such a police officer became an Officer in Charge and was paid an extra dollar and a half or a little more for his work. If a sergeant was on the shift, then the sergeant was in charge. What Martin did was assign a sergeant to Tomany's shift and refuse to transfer Tomany to a shift that did not have a sergeant.

nicknamed "Thirsty" which some interpreted to mean he was eager to arrest blacks, drank too much, was corrupt, or was eager to make drug arrests, (3) was the subject of refusals by other police departments to work with him because of perceived inappropriate conduct, (4) had a reputation in neighboring communities of violating rights in searches of cars, and (5) used the term "nigger" and, when dealing with citizens and members of the department, "defended" its use by saying that some of these individuals can be properly so characterized, and he said this even though he knew that his supervisors would not approve of his language.

Except for the use of the racial epithet, which is admitted, Tomany says these statements are hearsay on which Martin cannot rely. Moreover, the statements are incapable of proof or disproof. Hearsay, of course, can be relied on by supervisors evaluating subordinates and, if believed in good faith, offer valid reasons for conduct. Courts do have some reluctance in permitting such reliance when the hearsay cannot be confirmed or appears suspiciously convenient. One could characterize some of these reports on which Martin relied as questionable, but some are not. The opinion and conduct of neighboring police departments is capable of being disproved and so may the implicit opinions of members of the University Park Police Department. Some of what Martin heard came at community group meetings where many witnessed the complaints. It is not enough to say, as Tomany does, that "Anthony Martin . . . is not a credible witness on the subject," when more could have been shown. This is particularly true where Martin was no longer in the employ of University Park Police Department (from which he had been terminated) when he gave his deposition in this case. He is, in fact, no longer a party in this case, having been dismissed on joint motion of the parties.

There is no reason on the face of the testimony of Martin to cause one to doubt it. What both parties have failed to emphasize in their arguments is that Tomany was not discharged from the police department. Martin's decision was whether to allow Tomany to supervise other officers. The fact that some officers regarded Tomany as an exemplary police officer or even a "superstar" does not bear on the issue in this case.[3] There are many persons who make excellent employees (among them police officers) who will not make excellent or even competent supervisors.

In this case, Plaintiff points out that the atmosphere of the events at issue here was one of racial tension. Oddly, Defendants say this is not relevant. I say "oddly" because the best defense to this lawsuit is that, at a time of racial tension, it is reasonable (and not pretextual) to keep an officer who admittedly uses racial epithets from any role as a supervisor of other officers. Nor does it seem pretextual to remove from supervisory roles an officer whose reputation in neighboring police departments is less than good. Martin said Tomany was not allowed to supervise "based on what was in the best interest of the Department and the community at large. It is hoped that issues concerning enforcement biases and abuse will be resolved with the aforementioned personnel move." A further memo noted that the decision should not "be read to infer that any finding of probable cause . . . has been made against . . . Tomany regarding specific

---

[3]Tomany does not dispute that Martin observed Tomany make a stop and search of a vehicle and fail to document it as required. Based on what I have seen in courtrooms and in other offices, it is quite possible for police officers to turn in exemplary performances in the vast majority of their work and yet, for reasons of temperament or blind spots or bribe-taking, fall short of what is reasonably expected of them. Some of the best police officers are, at times, the worst police officers. And what may be tolerable conduct by a patrol officer may be unacceptable conduct for his or her supervisor. I express no personal view on Tomany's conduct as an officer. I consider only whether a reasonable trier of fact could find that the stated reasons for Martin's actions and those of others were a pretext for retaliation.

acts of enforcement bias abuse." Martin denies writing this memo, but it does not matter if he wrote it or not, or even if it is a forgery. It is consistent with his decision and serves only the purpose of protecting the department from admitting liability in a lawsuit against Tomany. To a reasonable trier of fact, the only appropriate conclusion here is that Martin made a decision to keep Tomany from supervising other officers to avoid community perception of bias. Given what Tomany does not deny doing and that which Tomany makes no effort to refute,[4] the decision cannot be shown to be taken in retaliation of anything Tomany testified to in the Kaupas case.

Finally, the decision to keep Tomany from supervising other officers for a period of time was not permanent. In 2006, Sergeant Box (who was directly accused of racism by Tomany) appointed Tomany as head of the Tactical Unit, which did involve supervision (but no pay raise).

The case for retaliation with respect to Tomany's functioning as an Officer in Charge is not supported by enough evidence to justify trial. The decision was made by an officer who had no personal grievance against Tomany. It was made on the basis of information upon which a decision maker can rely and which, in significant part, was either admitted or not contradicted. And the decision which was made, to eliminate Tomany's role as a supervisor, was made for reasons appropriate to such a decision. Indeed, Tomany was allowed to assume supervisory

---

[4] Martin asserted that he received a call from the Mokena Chief of Police who told Martin that if Tomany was caught in that village driving drunk one more time, Tomany would be arrested. There was apparently no effort to refute this assertion by interviewing the Chief in Mokena. Tomany similarly fails to refute the claimed reports of his driving drunk in Park Forest and Matteson. Nor was there an effort to refute Martin's assertion that the captain who headed the Will County Gang Suppression Unit said that he did not want Tomany ever sent back to that unit, a statement corroborated by Sergeant Box. The prosecutors in Will County also complained about Tomany.

duties after his testimony in the Kaupas case. There is no evidence of pretext, other than Tomany's firm conviction of it, to require trial on this point.[5]

There are other claims of retaliation in training opportunities and in disciplinary actions. The training claim fails because he did have as much, or more, training as other officers and was the only officer who was twice permitted to have training out-of-state. His discipline, whether deserved or not, was no greater than that of other officers. It must also be noted that he was not the subject of anything about which he complains until more than a year after his testimony in *Kaupas*. And, in any event, temporal proximity is not enough to establish a genuine issue of material fact. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) (recognizing that even a four-month proximity between the protected activity and adverse employment action fails to establish a causal connection between the two).

There is insufficient proof to meet the test of either the direct or indirect method of proof of retaliation, and the Defendants' motion for summary judgment is granted.

ENTER:

*[signature: James B. Zagel]*

James B. Zagel
United States District Judge

DATE: March 28, 2008

---

[5] One argument for pretext is that Martin made no formal charges against Tomany nor wrote him up for violations. These decisions, however, are consistent with the scope of Martin's concern over Tomany. He did not want to fire Tomany (who may have had some virtues as an officer or whose litigiousness may have made the transaction costs of formal charges too high to incur); he just wanted to keep him away from supervising.